UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:05-CR-107 |
| | ) | (VARLAN/SHIRLEY) |
| WENDELL BLAINE SCHAFFER | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the district court as may be appropriate. This matter is before the Court upon Defendant Wendell Schaffer's Motion To Suppress [Doc. 36] and Motion To Dismiss Indictment [Doc. 39], both filed on July 31, 2006. The parties came before the Court for an evidentiary hearing on August 22, 2006. Assistant United States Attorney Tracee Plowell was present representing the government. Attorney Boyd Venable was present representing Defendant Wendell Schaffer, who was also present. At the conclusion of the hearing, the undersigned requested post-hearing briefs from the parties by September 5, 2006. On September 5, 2006, Defendant Schaffer filed a Supplemental Brief [Doc. 55] and the government filed a Post-Hearing Supplemental Response [Doc. 54]. The Court took the motions and related filings under advisement on September 6, 2006.

# I. **POSITION OF THE PARTIES**

Defendant, Wendall Schaffer, has been indicted [Doc. 1] on a two-count indictment, alleging as follows: Count One charges that on January 24, 2005, Defendant did knowingly possess a firearm, a F.I.E. model SB, 20 gauge shotgun having a barrel length of less than eighteen inches, which was not registered to him in the National Firearms Registration and Transfer Record. Count Two charges Defendant with being a felon in possession of a firearm [20 gauge shotgun] on January 24, 2005.

These charges arise from the January 24, 2005, stop and search of Defendant's vehicle. Prior to the stop, Officer T. J. Scarbrough ("Scarbrough") of the Monroe County Police Department received a call from dispatch reporting that Wendall Schaffer [Defendant] was making threats with a gun at 138 Williams Road in Tellico Plains, Tennessee. Dispatch advised that Defendant had left the scene and was driving a black, Ford Ranger truck. Scarbrough responded to the scene and spotted a truck fitting the description given by dispatch traveling on Williams Road. Scarbrough activated his "blue lights" to effect a stop of the vehicle. Defendant pulled into the driveway located at 138 Williams Road and got out of his vehicle. Officer Scarbrough knew Defendant and recognized him when Defendant got out of the vehicle. Scarbrough placed Defendant in handcuffs and conducted a pat-down search. He recovered five 20 gauge shotgun rounds from Defendant's pocket. Defendant was placed in the rear of the police vehicle. Scarbrough returned to the truck to conduct a search and located a 20 gauge shotgun in the vehicle.

Defendant has moved [Doc. 36] to "suppress the fruits of the warrantless search on his automobile that produced the weapon." Defendant argues that: (1) he was seized without probable cause and the evidence seized as a result of the search resulting from the unlawful stop

must be suppressed, (2) the search of the vehicle was not incident to an arrest, thus, the search was unreasonable, and (3) the evidence [shotgun] seized was not in plain view. Defendant has also moved [Doc. 39] to dismiss the indictment on the grounds that there was a specific agreement with the federal government that he would not be indicted with the instant charge in exchange for cooperation in ongoing prosecutions. Defendant argues that said agreement is binding on the government, that Defendant suffered prejudice by entering into the agreement and complied with its terms. Finally, Defendant claims that it would be patently unfair to allow the government to prosecute him after he prejudiced himself.

As to the motion to suppress, the government responds [Doc. 45] that Officer Scarbrough had reasonable articulable suspicion that Defendant had recently engaged in criminal activity and, thus, could lawfully conduct an investigatory stop of the vehicle. Further, the government argues that Scarbrough could reasonably conclude that Defendant was armed and/or dangerous and that the shotgun was present in the vehicle. As such, it contends that the patdown search of Defendant and subsequent search of the vehicle was reasonable. Finally, it contends that Officer Scarbrough had probable cause to arrest Defendant prior to searching Defendant's vehicle for the following reasons: (1) Scarbrough knew Defendant was a convicted felon and, thus, the recovery of ammunition from Defendant's pocket gave him probable cause to arrest Defendant for being a convicted felon in possession of ammunition, (2) Scarbrough had probable cause to arrest Defendant for the felony assault once he confirmed Defendant's identity, and (3) Scarbrough could have properly arrested Defendant for driving with a revoked license. For the foregoing reasons, the government claims that the search of the vehicle was proper and within the bounds of the law.

As to the motion to dismiss the indictment, the government submits [Doc. 44] that

there was no such grant of immunity from federal prosecution made to Defendant and denies all allegations to the contrary.

## II. <u>SUPPRESSION HEARING TESTIMONY</u>

<u>a. Testimony of T. J. Scarbrough</u>

The only witness called by the government was Deputy T. J. Scarbrough ("Scarbrough"). For the past 90 days, Scarbrough has been employed as a patrol officer with the Loudon County Sheriff's Department. Prior to that, he was employed with the Monroe County Sheriff's Department for three years.

Scarbrough testified that he was working alone on January 24, 2005. He stated that he worked from 3 p.m. until 11 p.m. that day and that he wore a patrol uniform and was in a marked police vehicle. Scarbrough indicated that at approximately 8:40 p.m. on January 24, 2005, he received a call from dispatch that there "was a man...at 138 Williams Road, with a gun making threats." He stated that he was approximately 10-12 miles from the Williams Road area when he got the call. While en route to 138 Williams Road, Scarbrough testified that dispatch "was giving updates" and radioed that the complainant had identified the assailant as Wendall Schaffer and indicated that Schaffer was "leaving in a black Ford Ranger" truck. Scarbrough testified that prior to the incident that took place on January 24, 2005, he knew Wendall Shaffer [Defendant] from prior law enforcement contacts. Scarbrough stated that he knew Defendant on sight and identified him at the hearing.

Scarbrough testified that when he pulled on to Williams Road, a black Ford Ranger truck was sitting in the road. He stated that he activated his blue light and "tried to stop him."

4

Scarbrough testified that Defendant turned up the driveway at 138 Williams Road and "pulled over." Scarbrough stated that Defendant immediately got out of his vehicle and that he recognized Defendant when Defendant got out of the vehicle. Scarbrough stated that he jumped out of his patrol vehicle and asked Defendant to "let me see his hands." Scarbrough testified that he had his weapon drawn at Defendant and that Defendant cursed at him. Scarbrough stated that he again gave Defendant verbal commands to put his hands up when Defendant "kind of did a little half circle...dove back into the vehicle with his feet kind of hanging out, as if he was trying to get something." Scarbrough stated that he continued to yell verbal commands and that Defendant finally did come out with his hands.

Scarbrough testified that he then ordered Defendant to place his hands on the pickup truck and did a routine pat down of Defendant. He stated that he recovered five 20 gauge slug rounds in Defendant's right front pocket. Scarbrough testified that he then handcuffed Defendant for his and Defendant's safety. Scarbrough also indicated that he knew Defendant had a revoked license because of prior encounters with him. Scarbrough further testified that at this time, he was also aware of Defendant's criminal history and knew Defendant was a felon. After handcuffing Defendant, Scarbrough stated that he secured Defendant in the patrol car. Scarbrough indicated that at "about that time," Patrolman Ron Lane ("Lane") with Tellico City pulled up and they "went and searched the vehicle." He stated that Lane approached the driver's side and he approached the passenger side of the truck. Scarbrough testified that they "could see in plain view a shotgun, sawed-off shotgun, in the middle of the console propped up there in the floorboard." Scarbrough stated that the shotgun was loaded, with the hammer pulled back, when he recovered the shotgun.

Scarbrough indicated that from the time he first received the call until he arrived at the location and saw Defendant, approximately 16 minutes elapsed.

On cross examination, one Report [Def. Ex. 2] and four Affidavits of Complaint [Def. Ex. 1, 3-5] were introduced and received into evidence. Scarbrough agreed that he recognized Defendant, but clarified that he did not recognize Defendant until Defendant got out of his truck. He agreed that it was approximately nine o'clock at night. Scarbrough stated that he pulled Defendant over because the truck Defendant was driving fit the description dispatch had given him of the black Ford Ranger. Scarbrough indicated that he was "right on [Defendant's] bumper" when they stopped and that as soon as Defendant got out of the truck, Defendant faced Scarbrough, and Scarbrough knew who Defendant was. Scarbrough agreed that when he stopped Defendant, he knew that Defendant was a convicted felon and that his license was revoked and had not been reinstated. Scarbrough stated, however, that "I always call [dispatch] to confirm."

Scarbrough agreed that he asked Defendant to place his hands in open view and that Defendant refused. He also agreed that he drew his weapon and pointed it at Defendant. He denied that Officer Lane was there at that time. Scarbrough stated that Defendant was cuffed and put in the car by the time Officer Lane arrived. Scarbrough denied stating that Defendant had pointed a gun at him. Scarbrough agreed that Defendant placed his hands on the bed of the truck, but indicated that Defendant complied only after several requests were made. Scarbrough agreed that the police report [Def. Ex. 2] does not state that Defendant "eventually" put his hands on the truck, but instead states that "he did it."

Defense counsel next asked Scarbrough to look at the four Affidavits of Complaint [Def. Ex. 1, 3-5]. With regard to [Def. Ex. 3 and 4], which is an Affidavit of Complaint for Driving

on Revoked License, Scarbrough agreed that he checked with dispatch before finding out Defendant's license was revoked. He clarified that he always checks with dispatch as a routine matter. Scarbrough agreed that [Def. Ex. 3 and 4] does not state that he knew Defendant didn't have a driver's license. He also agreed that the Affidavit of Complaint for Prohibited Weapons does not state that he found ammunition [Def. Ex. 5].

Scarbrough stated that [when Defendant got out of his vehicle] Defendant appeared to be running from the vehicle, but then Defendant "stopped and run right back toward the car." Scarbrough agreed that Defendant was in his own driveway at the time. Scarbrough agreed that dispatch had said Defendant had been fleeing the scene. Scarbrough denied finding Defendant in the driveway at 138 Williams Road. He stated that he found Defendant on Williams Road and that once he activated the blue lights, Defendant turned into the driveway at 138 Williams Road. Scarbrough agreed that he could not see Defendant in the truck because the truck windows were dark. Scarbrough agreed that it took him approximately 15 minutes to get to Williams Road.

Referring to the police report [Def. Ex. 2], defense counsel questioned Scarbrough about stopping to speak to the Smiths [complainant]. Scarbrough agreed that he talked to the Smiths, but only after Defendant was placed in custody. Next, defense counsel read the portion of Scarbrough's statement found in [Def. Ex. 1], which is the Affidavit of Complaint for Aggravated Assault. In that Affidavit, defense counsel notes that Scarbrough stated, "Upon arrival, I spoke with Ron Smith." Scarbrough agreed that he made that statement in the warrant "dealing with the aggravated assault." Scarbrough denied speaking with the Smiths before pulling over Defendant.

Referring to the police report [Def. Ex. 2], Scarbrough agreed that the report states that he searched Defendant and found five 20 gauge shotgun rounds in his right pants pocket. He

also agreed that there was a round in the shotgun and that he took all six rounds into his possession. Scarbrough agreed that the report [Def. Ex. 2] does not indicate that he drew his gun on Defendant or that Defendant refused to obey his commands. Scarbrough denied searching Defendant's car before arresting him. He stated that he handcuffed Defendant for his safety, but agreed that he did not arrest Defendant for anything at that point. Scarbrough agreed that it was not until later that he arrested Defendant. He agreed that he searched the car anyway. Scarbrough denied searching Defendant's car before he called and confirmed that Defendant's license had been revoked.

Referring to [Def. Ex. 3], Scarbrough read for the Court the statement of facts contained in that Affidavit. Scarbrough denied that the statement contained in the Affidavit was different from his testimony at the hearing. Scarbrough agreed that the Affidavit for Driving on Revoked License [Def. Ex. 3] did not indicate that ammunition was seized. Referring to [Def. Ex. 5], Scarbrough read for the Court the statement of facts contained in the Affidavit for Prohibited Weapon. Scarbrough agreed that the Affidavit did not indicate that ammunition was seized. Scarbrough testified that all of the Affidavits of Complaint [Def. Ex. 1, 3-5] were done at the same time and denied that there was any difference [in facts] between them. When asked whether he would disagree with defense counsel's position that the "affidavits of complaint distinctly differ from each other for the same conduct", Scarbrough stated that, "I would say they describe each individual incident."

Scarbrough stated that he did not contact anyone about the prohibited weapon. He testified that, "[i]t was done through the detective at the department," whom he identified as Jim Shaw ("Shaw"). Scarbrough testified that Shaw heard the incident over the radio and asked him about it. He stated that Shaw told him that he had sent it to Steve Parris. Scarbrough stated that he

did not have anything else to do with it at that point. He indicated that the he did prosecute the case in General Sessions Court and that the DA told him that Jeb Brown and Mack Williams made a plea deal with Defendant. Scarbrough testified that he not know what the plea deal consisted of, nor did he know whether the aggravated assault charge had been dismissed.

On redirect examination, Scarbrough agreed that each Affidavit of Complaint [i.e., warrants] relates only to the specific charge cited in that warrant [aggravated assault, driving on revoked license, prohibited weapon]. He testified that he did not draft a warrant for Defendant being a felon in possession of ammunition because he was not aware that there was a state charge for same. Scarbrough indicated that he did not detail the facts about ammunition in the [prohibited weapons, aggravated assault] warrants because he did not think it was relevant. He stated that, "All I did was mention I found the loaded gun. It was loaded with the hammer pulled back." Scarbrough agreed that when he fills out a warrant, he only details the facts that go specifically to the charge in the warrant. He further indicated that the police report is the proper instrument for stating the details of the case. Scarbrough testified that his report [Def. Ex. 2] is a summary of what happened.

Scarbrough agreed that dispatch had initially reported that Defendant had fled the scene. Scarbrough testified that nearly 18 minutes elapsed from the time dispatch first called until the time he arrived at the Williams Road location. Scarbrough stated that he activated his blue lights when he first spotted Defendant's vehicle. He indicated that Defendant continued driving approximately 20 yards before he pulled into the driveway and stopped. Scarbrough agreed that the initial report was that Defendant fled the scene of the aggravated assault, not fled from Scarbrough. On recross examination, Scarbrough indicated that when he stopped Defendant, Defendant was approximately 150-200 yards from the "scene."

On redirect examination, Scarbrough was asked to explain what he did after he stopped the vehicle and conducted a pat down search of Defendant. Scarbrough testified that after he pulled the shotgun slugs out of Defendant's pockets, he handcuffed Defendant. Scarbrough agreed that at that time, he knew Defendant was a convicted felon and was prohibited from possessing ammunition. He stated that he did not arrest Defendant for the ammunition, but instead remembered running Defendant's license while Defendant was standing there. Scarbrough stated that Defendant had told him that he didn't have a license and dispatch confirmed that Defendant's license was revoked. Scarbrough stated that he then told Defendant he was under arrest. He testified that Patrolman Lane arrived around that time; they proceeded to search Defendant's vehicle and located the shotgun. Scarbrough indicated that, at that point, he did not make any determinations as to what other charges would be brought against Defendant. He stated that Patrolman Lane secured Defendant's vehicle while he went to talk to Mr. Smith about the aggravated assault incident. Scarbrough indicated that once he got back to the Sheriff's Department, he showed his sergeant the shotgun and Defendant was charged with having a prohibited weapon.

On recross examination, Scarbrough agreed that his "reports" didn't really give the above interpretation. When questioned about [Def. Ex. 1, Aggravated Assault] which states, "Upon arrival I spoke with Ron Smith," Scarbrough denied that speaking with Mr. Smith was the first thing he did when he arrived at the Williams Road location. Scarbrough clarified that "Upon arrival" meant, when he arrived at Ron Smith's house. As to [Def. Ex. 5, Prohibited Weapon], Scarbrough agreed that the Affidavit states that he made a traffic stop on a black Ford Ranger on Williams Road. Scarbrough denied that he searched the vehicle first. He stated that the first thing he did was handcuff Defendant.

b.  Testimony of Steven Parris

With regard to Defendant's Motion To Dismiss Indictment [Doc. 39], Defendant called Steven Parris ("Parris") as his first witness.  Parris is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives.  Parris testified that his territory includes Monroe County.  He stated that he first became aware of Defendant's arrest for a prohibited weapon "sometime shortly after the date of arrest of January 24, 2005."  Parris testified that he was unsure of the exact date that the case was submitted to the United States Attorney's office.  He indicated that once he completes his investigation of a case, he submits the case to his supervisor.  Parris stated that he had "no idea" when the United States Attorney's office received the case.

Parris testified  that Detective Jim Shaw contacted him about Defendant's case.  Parris stated that he was familiar with Detective Mack Williams ("Williams"), but that he "never spoke to Williams about this case at all."  When asked whether he was aware that Williams had an agreement with Defendant not to have him prosecuted, Parris stated, "whatever agreement Mr. Williams had was between Mr. Williams and Mr. Shaffer.  It wasn't my agreement."  When asked whether he had spoken with Williams about the alleged agreement, Parris stated that some time after Defendant was indicted, Williams said to Parris, "hey, don't you remember, I thought I talked to you about not prosecuting that case."  Parris indicated that he could not recall that conversation ever occurring.  When asked whether he was aware that Defendant cooperated with Detective Williams in exchange for his promise not to have him prosecuted, Parris stated that he had "no idea" what Williams and Defendant talked about or what Defendant actually did in that regard.

On cross examination, Parris testified that he is not authorized, nor has he ever been authorized, to grant immunity from prosecution to any individual.  He stated that he was not

authorized by the United States Attorney's Office to grant immunity from federal prosecution to Defendant Wendall Schaffer, nor did he grant immunity from federal prosecution to Defendant Schaffer. Parris further indicated that he has never even spoken to Defendant Wendall Schaffer.

c. Testimony of George "Mack" Williams

Defendant next called Detective Mack Williams ("Williams"). Williams testified that he had known Defendant Schaffer for 12 or 13 years. He stated that there was an agreement with Agent Parris not to prosecute Defendant for the firearms conviction. Williams testified that Defendant was working with his narcotics agent, Jeb Brown ("Brown"), as an informant. He stated that Brown notified him that Deputy Scarbrough had picked Wendall up on some charges and that Brown asked him to talk to Scarbrough about holding off because Defendant was helping Brown. Williams indicated that he talked to Deputy Scarbrough and Scarbrough was fine with that. Williams further indicated that, "[i]n the meantime, Detective Jim Shaw had given Agent Parris the paperwork for the federal courts to see if they could work up a case on him."

Williams testified that Brown asked him to talk to Agent Parris. Williams stated that it was his "recollection" that he "told Steve to hold off on it, that Wendall was helping us with some drug cases and was doing good at it and we needed him to hold off." He testified that it was his "recollection" that Agent Parris agreed to that. Williams stated that he is "pretty well" acquainted with Agent Parris and that he sees Agent Parris "quite often" at the Sheriff's Department. Williams could not remember the date when he entered into the agreement with Agent Parris, but indicated that it could have been the first part of February, 2005. Williams stated that he was not aware that the matter was being considered federally until "Agent Parris came to the office one day and said

he had an indictment on Wendall." Williams testified that from the time he first contacted Agent Parris until the time he learned about the federal indictment, Defendant worked with drug Agent Brown. As to state court matters, Williams stated that he had asked the district attorney if he would "work something out" with Defendant and Deputy Scarbrough. He indicated that he didn't go to court and didn't know if that was ever done or not.

On cross examination, Williams testified that he had been with the Monroe County Sheriff's Department for approximately 12 years. At this time, William's affidavit [Doc. 44-2] was marked as Exhibit 1 and received into evidence [Gov. Ex. 1]. William's agreed that the affidavit was accurate. He agreed that Defendant Schaffer was working as an informant, under the supervision of Jeb Brown, prior to his arrest on January 24, 2005. William's agreed that he contacted Agent Parris and asked him to "hold off on the charges." When asked what he meant by "hold off," Williams testified that it meant "just to hang on to it until we see if Wendall is going to fulfill his agreement with us. If he didn't, I told Steve to go ahead with it, if he don't fulfill it. I will let you know." Williams stated that he could not remember when he had that conversation with Agent Parris.

William's testified that he knew Detective Shaw had handed the case over to Agent Parris and that this was the reason he talked to Parris about holding off. Williams testified that Agent Parris did not agree that Defendant would not be prosecuted in federal court, but instead agreed that "he [Parris] would hold off until we asked him to." Williams also testified that, to his knowledge, Parris and Defendant had never talked. Williams agreed that any representations regarding whether the case would be prosecuted were made by him to Defendant. Williams stated that he was never authorized by the United States Attorney's Office to make any promises regarding

immunity from prosecution for this Defendant. Williams also stated that he was not authorized by the Bureau of Alcohol, Tobacco, Firearms & Explosives to grant immunity from federal prosecution to this Defendant.

On redirect examination, Williams agreed that he specifically requested that Defendant investigate Mike and Charles Cane. On recross examination, Williams was asked whether Defendant's continued cooperation was a result of the disposition of his firearms charges. Williams responded, "No. When I met with Mr. Schaffer myself and Detective Brown met with him at our normal meeting place and Wendall was talking about it and he said it didn't matter. He said if he got prosecuted, he would help us with that case anyway. It didn't matter to him." On redirect examination, Williams indicated that he did not think Defendant would have continued to do dangerous work if he wasn't going to get his federal firearms charge taken care of. He further indicated that Defendant, in response to his asking Defendant what he was going to do if they couldn't take care of it, stated, "well, I will go ahead and help Jeb with the case."

d. Testimony of Jeb Brown

Defendant next called Detective Jeb Brown ("Brown"). Brown testified that he had known Defendant for several years and had used him in an informant capacity before. He stated that Defendant was willing to work for them [Detectives Williams and Brown] to keep his charges on a state level and to not be prosecuted federally. When asked what he did to effect that agreement, Brown testified that Detective Williams approached him and told him that Defendant had information that could help him. Brown stated that he "basically just worked Wendall and let everything else fall into place through, you know, Captain Williams." Brown testified that, to his

knowledge, there was an agreement, but he did not discuss it with Steve Parris. When asked whether the agreement was with the ATF, Brown stated that he was unsure because he was not present when it occurred. He did state, however, "I knew that Mack [Williams] had said that, you know, he had talked to I guess the ATF. I am not sure though."

On cross examination, Brown testified that Defendant had worked as an informant for him for several months. When asked whether Defendant started working as an informant prior to the January 24, 2005 arrest, Brown said, "No. I don't think so." When asked how it came about that Defendant was going to be an informant for him, Brown said, "Captain Williams approached me and said Wendall had some information and could do some work for me." Brown estimated that Defendant worked for him for approximately four or six weeks after his January 24, 2005 arrest. Brown stated that it was his understanding that Defendant cooperated in order that his weapons charge would not be taken to federal court. Brown indicated that he "arrived at this understanding...that we would try to keep his charges at a state level" from Captain Williams. Brown stated that never spoke to anyone at the ATF regarding Defendant. When asked whether he ever made any specific promises to Defendant regarding immunity from federal prosecution, Brown stated, "I told him that we would do everything we could to keep it at state level. Yes, I did." Brown testified that he was neither authorized by the Bureau of Alcohol, Tobacco, Firearms & Explosives nor the United States Attorney to grant immunity from federal prosecution.

### III.  FINDINGS OF FACT

The Court makes its factual findings in the analysis section of the report.


### IV.  <u>ANALYSIS - MOTION TO SUPPRESS</u>

Defendant contends that his rights under the Fourth Amendment were violated because: (1) Officer Scarbrough had neither probable cause nor reasonable suspicion to stop and detain him on January 24, 2005, and (2) the warrantless search of his vehicle was unreasonable because the evidence seized was not in plain view and the search was conducted prior to his arrest. The government, on the other hand, contends that because Officer Scarbrough had a reasonable articulable suspicion that Defendant had recently engaged in criminal activity, Scarbrough could lawfully conduct an investigatory stop of Defendant's vehicle.  Further, the government argues that not only was the pat down search of Defendant and subsequent search of the vehicle reasonable under <u>Terry</u>, but because the search was also roughly contemporaneous with the arrest and there was probable cause to arrest Defendant independent of the fruits of the search, the search was valid. Finally, the government argues that because Officers Scarbrough and Patrolman Lane observed the shotgun in plain view in Defendant's vehicle, the evidence was lawfully obtained.

The first question the Court will address is whether, at the moment Officer Scarbrough initiated the stop of Defendant's vehicle, the totality of the circumstances provided the officer with the reasonable suspicion necessary to justify the stop of Defendant Schaffer's vehicle under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).  Defendant Schaffer argues [Doc. 55, p. 10] that Officer Scarbrough, "according to his own testimony,... had not talked to the Smith's [complaining party]" and, thus, "[t]he complaining party's allegations were uninvestigated, unverified, and incapable of

supplying probable cause for a detention or search."  Defendant further argues that Officer

Scarbrough observed no illegal activity on behalf of the black Ford Ranger truck to justify the stop

and/or warrantless search of Defendant.

A law enforcement officer may make a brief investigatory stop of an individual so

long as there is a reasonable basis for doing so.  Terry, 392 U.S. at 22-24.  Specifically, "the police

can stop and briefly detain a person for investigative purposes if the officer has a reasonable

suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer

lacks probable cause."  United States v. Erwin, 155 F.3d 818, 822 (6th Cir. 1998) (citing United

States v. Sokolow, 490 U.S. 1, 7 (1989).  Reasonable suspicion need not arise from an officer's

direct observation, but can be based on informant tips and dispatcher information.  Smoak v. Hall,

2006 WL 2455321 (6th Cir. Aug. 25, 2006) (citing Erwin, 155 F.3d at 822) ("A law enforcement

officer is generally justified in stopping an individual and asking for identification when relying on

information transmitted by a valid police bulletin.") (citing United States v. Hensley[1], 469 U.S. 221,

232 (1985)).  Furthermore, when police action is based on a tip from an informant, the court must

consider the veracity and credibility of the informant.  United States v. White, 496 U.S. 325, 328

(1990).  Unlike known or identified informants, anonymous tipsters, without more, cannot be

deemed reliable regarding their allegations.  Florida v. J.L, 529 U.S. 266, 270 (2000).

In the present case, the Court finds that based on the information available to Officer

Scarbrough at the time he initiated the stop, he (1) had sufficient information to support a finding

of reasonable suspicion that a felonious assault had occurred at 138 Williams Road in Tellico Plains

---

[1] In Hensley, the Supreme Court ruled that a Terry stop based on reasonable suspicion that came from a
police bulletin or flyer from other officials is permissible to whatever extent the bulletin itself was based on
articulable facts that would support reasonable suspicion.  469 U.S. at 232.

as reported to him by police dispatch, and (2) was justified in stopping Defendant's vehicle upon observing a vehicle matching the description of the suspect's vehicle in a location within close proximity to the 138 Williams Road address. As to the first prong, the Court more specifically finds that dispatch transmitted the following information to Officer Scarbrough, which Scarbrough then relied upon to initiate an investigative stop of Defendant: (1) dispatch reported they had received a 911 call from an individual who reported that there was a man at 138 Williams Road, with a gun making threats, (2) dispatch reported that the caller had identified the assailant as Wendall Schaffer, and (3) dispatch reported that the caller had indicated that Schaffer was leaving in a black, Ford Ranger truck. Moreover, the caller who reported this information to dispatch was not anonymous. He was identified as Mr. Smith and his address was known to Officer Scarbrough, who testified that after he and Patrolman Lane secured Defendant's vehicle, he went to talk to Mr. Smith about the aggravated assault incident. Further, Mr. Smith knew his alleged assailant and specifically reported that information, along with the color, make and model of the vehicle his assailant was driving, to dispatch. Based on the foregoing, the Court finds that the level of trustworthiness in this case can be easily distinguished from cases in which the informant is purely anonymous.

As to the second prong above, the Court finds that there was reasonable suspicion to justify an investigative stop of Defendant based on the fact that Officer Scarbrough observed a truck, matching the description given by dispatch, traveling on Williams Road approximately 20 yards from the 138 Williams Road address. As discussed above, dispatch reported that the suspect, William Schaffer, was driving a black, Ford Ranger truck. When Officer Scarbrough turned on to Williams Road, he saw a truck matching the color, make and model of the suspect's vehicle traveling in the direction of 138 Williams Road. Scarbrough testified that upon activating his blue

18

lights, Defendant drove approximately 20 more yards before turning into the driveway at 138 Williams Road. At the suppression hearing, Defendant argued that (1) because Officer Scarbrough could not see who was driving the truck when he initiated the stop, and (2) because Defendant was driving toward the scene of the alleged incident instead of driving away from the scene, Officer Scarbrough lacked the reasonable suspicion necessary to justify the stop under <u>Terry</u>. The Court disagrees with Defendant.

In reviewing a challenged investigative stop, "the totality of the circumstances - the whole picture - must be taken into account." <u>United States v. Hurst</u>, 288 F.3d 751, 757 (6th Cir. 2000). An officer who decides to conduct a <u>Terry</u> stop must be acting on more than his or her "inchoate and uparticularized suspicion or 'hunch,' but [on] the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." <u>United States v. Foster</u>, 376 F.3d 577, 585 (6th Cir. 2004) (citing <u>Terry</u>, 392 U.S. 1 at 27)). Furthermore, "in assessing the reasonableness of the stop, the facts are 'judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in belief that the action taken was appropriate?'" <u>Id.</u>

From the time Officer Scarbrough received the call from dispatch until the time he saw the black, Ford Ranger truck on Williams Road, approximately sixteen (16) minutes had elapsed. Before arriving at the scene, Officer Scarbrough knew that a known victim, at a specific location, claimed to have been threatened by a known assailant with a gun and that the assailant had left in a specifically identified vehicle. Upon arriving at or near the specific location on Williams Road, Officer Scarbrough observed a vehicle matching the exact color, make and model reported

by dispatch of the assailant's vehicle.[2]  The Court finds that the foregoing facts are certainly sufficient to create reasonable suspicion in Officer Scarbrough's mind that the occupant of this vehicle, in this specific location, might be engaged or involved in the criminal activity alleged. Moreover, under these particular facts, the Court notes that Officer Scarbrough would have been derelict in not investigating this vehicle further.  Thus, the Court finds that the convergence of the specific location and specific vehicle alone created reasonable suspicion to conduct a brief <u>Terry</u> investigation and, therefore, the stop of the vehicle was both proper and appropriate under the totality of the circumstances.

Furthermore, once the vehicle responded to the blue lights and pulled into the driveway located at the specific location reported by dispatch [138 Williams Road], the driver immediately exited the vehicle.  At this time, Officer Scarbrough was able to positively identify the driver as the specific alleged assailant and, thus, the reasonable suspicion increased and the known victim's statements had all been corroborated except for the presence of a gun.  Accordingly, based on the totality of the circumstances, the Court finds that Officer Scarbrough was able to point to specific and articulable facts which, taken together with rational inferences from those facts, justified the stop of Defendant's vehicle and Defendant's detention.

Having found that Officer Scarbrough had a reasonable suspicion sufficient to conduct a <u>Terry</u> stop, the Court will next address whether Officer Scarbrough's patdown search of

---

[2]  <u>See</u> <u>Hurst</u>, 288 F.3d at 757.  In <u>Hurst</u>, the Sixth Circuit upheld a finding of reasonable suspicion where an off-duty sheriff's deputy who had heard a description of a fleeing burglary suspect that was broadcast over the police radio, observed a vehicle matching the description at a location consistent with the time needed to travel to that point from the residence in question.  <u>See</u> also <u>United States v. Townsend</u>, 330 F.3d 438 (6th Cir. 2003).  In <u>Townsend</u>, the Sixth Circuit upheld a finding of reasonable and articulable suspicion where the police, in stopping the defendant Townsend, relied upon numerous factors, including that police knew the color, model, and tag number of Townsend's vehicle, as well as the direction in which he was traveling.

Defendant for weapons and subsequent search of the vehicle was proper. The government contends that because police dispatch informed that Defendant was making threats with a gun and because Officer Scarbrough encountered Defendant in close proximity to the incident, Officer Scarbrough could reasonably conclude that Defendant was armed and/or dangerous and that the shotgun was present in the vehicle. As such, the government contends that the pat down search of Defendant and subsequent search of the vehicle was reasonable under Terry. The Court agrees.

When an individual is subject to a lawful investigative stop, an officer may conduct a limited frisk or pat down of that person for weapons if the officer has reasonable suspicion of criminal activity and a reasonable belief that the suspect he is investigating at close range may be armed and dangerous. Terry, 392 U.S. at 26-27; United States v. Walker, 181 F.3d 774, 778 (6th Cir. 1999). "[T]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [officer under] the circumstances would be warranted in the belief that his safety and that of others was in danger." Terry, 392 U.S. at 27; see also United States v. Thomas, No. 04-5872, 2005 WL 1869676, *2 (6th Cir. Aug. 3, 2005). In other words, "[t]he purpose of the search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence." United States v. Vite-Espinoza, 342 F.3d 462, 466 (6th Cir. 2003). In determining whether an officer's suspicion of danger and subsequent conduct are reasonable, "due weight must be given, not to his unchoate and unparticularized suspicion or 'hunch' but to specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Terry, 392 U.S. at 27. Moreover, the Sixth Circuit has held that in an investigatory stop situation where police officers have reason to believe that an occupant of a vehicle is armed and dangerous, the officer may order an occupant from a car for their own safety. Garza, 10 F.3d at

1246.  The Sixth Circuit has also found that "the use of handcuffs [does not] exceed the bounds of a <u>Terry</u> stop, so long as the circumstances warrant that precaution."  <u>United States v. Foster</u>, 376 F.3d 577, 586 (6th Cir. 2004).

In this case, the Court finds that:  Officer Scarbrough was dispatched to 138 Williams Road based on a 911 call that a man with a gun was making threats at that address.  While en route to Williams Road, dispatch informed Officer Scarbrough that the caller had identified his assailant as Wendall Schaffer and indicated that Schaffer was leaving in a black, Ford Ranger truck.  When Scarbrough pulled on to Williams Road, he observed a black, Ford Ranger truck sitting in the road.  Scarbrough activated his lights; Defendant drove approximately 20 more yards before turning into the driveway at 138 Williams Road.  Defendant stopped his vehicle and immediately got out of the vehicle without being instructed to do so.  Officer Scarbrough knew Defendant from previous law enforcement contacts and recognized him as Wendall Schaffer upon sight.  Officer Scarbrough had his weapon drawn at Defendant and yelled verbal commands at Defendant to show his hands.  Defendant did not obey these commands but, instead, turned around and lunged back into his car.  Officer Scarbrough continued yelling verbal commands at Defendant and Defendant eventually came out with his hands up.  Officer Scarbrough then ordered Defendant to place his hands on the truck and did a routine pat down of Defendant.  Scarbrough recovered five 20 gauge slug rounds from Defendant's right front pocket.  Scarbrough handcuffed Defendant and secured Defendant in the patrol car.  At this time, Patrolman Ron Lane arrived and together they searched Defendant's vehicle.  The officers recovered a loaded, sawed-off shotgun, in the middle of the console propped up in the floorboard.

First, the Court notes that it has already found that, up to this point, all the victims

statements had already been corroborated except for the presence of a gun. Thus, the fact that Officer Scarbrough had stopped a vehicle, which matched the victim's description of same, in close proximity to the incident, and could positively identify the driver as the alleged assailant would have alone permitted the patdown search of Defendant for weapons. Additionally, the fact that Defendant was reported to have a gun, failed to obey Officer Scarbrough's verbal commands and made a furtive lunge back into the vehicle makes the legal justification for a patdown/frisk to be beyond question. Accordingly, the Court finds that Officer Scarbrough could reasonably conclude that Defendant was armed and/or dangerous and, thus, could certainly conduct a limited pat down or frisk for weapons for officer safety.

Furthermore, while the evidence indicates that Defendant was not handcuffed until after the pat down search was completed, the Court finds that the use of handcuffs did not exceed the bounds of a Terry stop because the circumstances in this case warranted that precaution. Specifically, the Court finds that because (1) Defendant was reported to have a gun and five 20 gauge slug rounds were located in Defendant's pocket during the pat down search, (2) Officer Scarbrough's backup, Patrolman Lane, had not yet arrived, and (3) Defendant had previously failed to obey Officer Scarbrough's verbal commands and had made a furtive lunge back into his vehicle, Officer Scarbrough was justified in placing Defendant in handcuffs and securing Defendant in the patrol car while he continued to pursue his investigation.

Next, having found that Officer Scarbrough could have reasonably believed Defendant was potentially armed and dangerous, and that the frisk of Defendant was therefore proper, the Court must next determine whether the warrantless search of Defendant's vehicle was proper. Defendant argues that the search was unreasonable because the evidence seized was not in

plain view and the search was conducted prior to his arrest. The government, on the hand, argues that the search of Defendant's vehicle following the initial pat down of his person was justified either as a permissible extension of <u>Terry</u>, or under the plain view doctrine. The government also argues that the search was roughly contemporaneous with Defendant's arrest and, thus, would be valid as a search incident to arrest.

The rationale of <u>Terry</u> has been extended to permit limited searches of the vehicle's passenger compartment where a police officer possess a reasonable belief based on "specific or articulable facts, which taken with rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. <u>Michigan v. Long</u>, 463 U.S. 1032, 1049 (1983). The scope of the protective search may include those areas in which a weapon may be placed or hidden. <u>Long</u>, 463 U.S. at 1049. The Supreme Court has recognized that a suspect may break away from police control and retrieve a weapon from his vehicle. <u>Id.</u> At 1051; <u>see also</u> <u>United States v. Paulino</u>, 935 F.2d 739, 747 (6th Cir. 1991) (holding that six police officers on scene separating suspect from cooler possibly containing weapon did not obviate need for protective search of vehicle). Furthermore, an officer may also anticipate allowing the suspect to reenter the vehicle after the stop, at which time the suspect may retrieve any hidden weapons. <u>Long</u>, 463 U.S. at 1051-52. Moreover, the Sixth Circuit had held that "[t]he 'patdown' of a vehicle need not be predicated on the discovery of a weapon on a suspect's person." <u>United States v. Slater</u>, 81 F.3d 162, 1996 WL 143460 * 3 (6th Cir. March 28, 1996) (citing <u>United States v. Holified</u>, 956 F.2d 665, 668-69 (7th Cir. 1992)); <u>see also</u> <u>Evans</u>, 994 F.2d at 321, and <u>Butcher</u>, 1993 WL 272450 at *6, (finding that furtive movement coupled with facts linking suspect to known dangerous activities, justified <u>Terry</u> search of vehicle).

In this case, during the pat down search of Defendant for weapons, Officer Scarbrough recovered five 20 gauge slug rounds from Defendant's front pocket. That fact, coupled with the fact that (1) Scarbrough identified the driver as the alleged assailant [Wendall Schaffer] upon sight, (2) Defendant Schaffer was reported to have a gun which he allegedly used to threaten someone, (3) Defendant Schaffer ignored Scarbrough's verbal commands to show his hands and, instead, made a furtive lunge back into his vehicle, justified Officer Scarbrough's reasonable belief that "the suspect is dangerous and the suspect may gain immediate control of weapons." Long, 463 U.S. at 1049. Thus, while police may not conduct automobile searches whenever an investigative Terry stop is made, the resulting search of the passenger compartment of Defendant Schaffer's vehicle in this case was a proper protective search. Id. at n. 14. See also United States v. Deloney, 114 F.3d 1189, 1997 WL 251919, *1 (th Cir. 1997) (unpublished opinion). In other words, once ammunition was discovered on Defendant's person, and in light of the totality of the circumstances known to the officer, it was entirely reasonable to suspect that a gun (likely a shotgun based on nature of the ammunition found) was present, and if not on Defendant, it was likely to be located in the vehicle. In fact, while searching the vehicle for weapons, Officer Scarbrough and Patrolman Lane did discover a shotgun in the passenger compartment. Furthermore, the shotgun was located in the middle of the console propped up in the floorboard, which is an area that Defendant would have immediate control. Long, 463 U.S. at 1049-50.

Based on the foregoing, the Court finds that Officer Scarbrough did not act unreasonably in taking preventative measures to ensure that there were no weapons in Defendant's vehicle which he could gain control of. As such, the Court recommends that the District Court deny Defendant Schaffer's request to suppress the evidence seized from Defendant's person (ammunition)

and from Defendant's vehicle (20 gauge shotgun).

Having found that the evidence should not be suppressed for the above reasons, the Court will only briefly address the government's other arguments, namely that the seizure of the shotgun was also justified under the plain view doctrine or as a search incident to an arrest. First, based on Officer Scarbrough uncontradicted testimony that the shotgun was in plain view, the Court finds that the shotgun was in plain view and, thus, was legally seized. Further, as Officer Scarbrough's uncontradicted testimony indicated, he knew Defendant was a convicted felon and, therefore, the ammunition recovered from Defendant's person constituted contraband in Defendant's possession. As such, the search incident to arrest and/or search roughly contemporaneous to arrest was proper.

## V.  ANALYSIS - MOTION TO DISMISS INDICTMENT

Defendant has moved to dismiss the indictment [Docs. 39] on the grounds that there was a specific agreement between ATF Agent Steve Parris, Defendant, Mack Williams (of the Monroe County Sheriff's Department), and Jeb Brown (of the Monroe County drug enforcement), that Defendant Schaffer "would be used as an undercover, confidential informant in a variety of investigations and prosecutions, and that in exchange for that agreement, the prohibited weapons charge would not be submitted as an indictable offense" [Doc. 37]. Defendant further contends that Agent Parris was authorized to enter into the agreement and that Defendant suffered "actual and substantial prejudice" by performing dangerous undercover work in reliance on said agreement. The government, on the other hand, asserts [Doc. 44] that no such promise of immunity from federal prosecution was made by either Agent Parris or the United States Attorney. Nonetheless, it contends

that even if Agent Parris had granted immunity to Defendant, such promise is not binding on the United States because (1) Agent Parris lacked the authority to make the alleged promise not to prosecute, and (2) Defendant cannot demonstrate any detrimental reliance on the alleged promise.

Initially, the Court must determine (1) whether there was an agreement, (2) with whom the agreement was made, and (3) the nature and scope of that agreement. Contradictory evidence was introduced at the suppression hearing with regard to whether an agreement was made and the nature and scope of that agreement. Defendant argued that there was a "firm agreement not to prosecute" [Doc. 37, p. 2] between himself, Agent Parris and Detectives Williams and Brown. Detective Williams supported Defendant's contention by testifying that he contacted Agent Parris and asked him to "hold off on the charges." When asked what he meant by "hold off," Williams testified that it meant "just to hang on to it until we see if Wendall is going to fulfill his agreement with us." Williams further clarified that Parris did not agree that Defendant would not be prosecuted, but agreed only that "he [Parris] would hold off until we asked him to." Detective Brown also testified that, even though he wasn't present when the agreement was made, it was his understanding that an agreement did exist and that Defendant agreed to cooperate with them [Monroe County Sheriff's Department] in order that his weapons charge would not be prosecuted in federal court.

Agent Parris testified, however, that he had "never spoken" to either Defendant Schaffer or Detective Williams about Defendant's case and that "whatever agreement Mr. Williams had was between Mr. Williams and Mr. Schaffer." Parris nonetheless indicted that some time after Defendant was indicted, Detective Williams said to Parris, "hey, don't you remember, I thought I talked to you about not prosecuting that case." Parris stated that he could not recall that

conversation ever occurring.

Despite ATF Agent Parris's contention to the contrary and/or lack of recollection, the Court finds that some form of an agreement to "hold off" prosecution was made between Agent Parris and Detective Williams with regard to Defendant Schaffer's federal weapons charge. While the exact terms of that agreement are unclear, the evidence does support the Court's finding that Agent Parris <u>never</u> agreed that the case would not be prosecuted. Rather, Agent Parris agreed that he would "hold off" prosecution while Detectives Williams and Brown utilized Defendant as an informant in a variety of investigations and prosecutions. To the extent Defendant argues that there was a "firm agreement not to prosecute," the Court disagrees. The Court finds, at best, that there was a loose agreement to "hold off" prosecution, but no agreement was made by Agent Parris not to prosecute Defendant.

Nonetheless, even if the Court were to find that the exchange between Detective Williams and Agent Parris constituted a promise not to prosecute Defendant and Agent Parris breached that promise when he submitted the case to the United States Attorney's Office, the outcome would remain the same because Defendant has failed to satisfy either requirement of the test set forth in <u>United States v. Streebing</u>. While "'[a]s a general rule, fundamental fairness requires that promises made during plea-bargaining and analogous contexts be respected', this rule is subject to two conditions: (1) the agent must be authorized to make the promise; and (2) the defendant must rely to his detriment on the promise." <u>Streebing</u>, 987 F.2d 368, 372 (6th Cir. 1993). The Court finds that Agent Parris lacked the authority to make the alleged promise not to prosecute and prosecution, despite the breach, was not unfair because Defendant Schaffer did not rely to his detriment on the promise.

First, the record is devoid of any evidence establishing that ATF Agent Parris was authorized to grant immunity from prosecution to Defendant Schaffer. In fact, Agent Parris, Detective Williams and Detective Brown each specifically testified they were not authorized by the United States Attorney's Office to grant immunity to this Defendant. Based on the testimony adduced at the hearing, the Court finds that at no time did the United States Attorney ever offer Defendant immunity from prosecution, nor did the United States Attorney authorize anyone else to grant immunity to this Defendant. Therefore, because Agent Parris lacked any actual or apparent authority to make the alleged promise not to prosecute, the Court finds that said promise is unenforceable. See Streebing, 987 F.2d at 373. To the extent that Defendant argues that Agent Parris had "implied authority" to make the alleged promise not to prosecute, the Court is not likewise convinced. As Defendant points out, "[a]uthority to bind the [g]overnment is generally implied when such authority is considered to be an integral part of the duties assigned to a government employee." H. Landau & Co. v. United States, 886 F.2d 322, 324 (6th Cir. 1989). Agent Parris testified that he has never been authorized to grant immunity from prosecution to any individual. Thus, the Court finds that the authority to grant immunity from federal prosecution is not "an integral part of the duties assigned" to Agent Parris. As such, Agent Parris did not have implied authority to make the alleged promise.

Second, Defendant Schaffer did not rely to his detriment upon the alleged promise not to prosecute. In Streebing, the defendant was charged with nine counts of mail fraud and three counts of making false statements in connection with an alleged scheme to defraud the Social Security Administration and Aetna Life Insurance Company of disability benefits. 987 F.2d at 370. Prior to trial, the defendant filed a motion to dismiss the indictment alleging that the FBI agent told

defendant "both directly and impliedly that if he cooperated and made a statement and told the agent what he wanted to hear, there would be no prosecution and there would [be] no indictment." 987 F.2d at 371. The District Court denied the motion, holding that, "[e]ven assuming the FBI agent told defendant he would not be prosecuted if he cooperated (an assertion which the government strongly denied), defendant failed to show that he "was demonstrably prejudiced by the violation." 987 F.2d at 372. The Court based its decision that there was no prejudice on the government's stipulation that none of the statements made by defendant were presented to the grand jury, nor would they be used at trial. Id.

The Court finds that Streebing is distinct from this case, in that Defendant Schaffer did not make any inculpatory statements and admissions with respect to activities charged in the indictment [Doc. 1]. In fact, unlike the FBI Agent in Streebing, Agent Parris had no direct contact whatsoever with Defendant Schaffer in this case. Instead, it was Detective Williams of the Monroe County Sheriff's Department who communicated the alleged promise not to prosecute to Defendant. Furthermore, according to Detectives Williams and Brown, the promise not to prosecute Defendant on the federal weapons charge hinged upon Defendant's cooperation as a confidential informant for them in certain narcotics investigations. In other words, Defendant's cooperation with the Monroe County Sheriff's Department was in no way related to the activities charted in the indictment [Doc. 1]. Thus, the Court finds that Defendant's alleged cooperation with the Monroe County Sheriff's Department has no direct bearing on the case at hand because there is no evidence that Defendant made any statement relevant to this case to ATF Agent Parris in exchange for an agreement not to prosecute. Accordingly, the Court finds that Defendant is in no worse a position now than he was at any time prior to or after the alleged promise was made, and as such, he suffered neither prejudice

nor detrimental reliance.  See Streebing, 987 F.2d at 373.

     To the extent Defendant argues that he  suffered "actual and substantial prejudice" by performing dangerous undercover work in reliance on the alleged promise, the Court would first note that there is conflicting testimony with regards to when Defendant actually began working as an informant for Detectives Williams and Brown.   Detective Williams testified that Defendant began working as a narcotics informant, under the supervision of Detective Brown, prior to Defendant's arrest on January 24, 2005; this information was also set forth in a sworn affidavit [Doc. 44].   However, Detective Brown testified that Defendant did not began working for him until sometime after Defendant's January 24, 2005, arrest.  In addition to the aforementioned conflicting testimony, Detective Williams testified that Defendant had stated that he would continue to help the Detectives even if he was ultimately prosecuted on the federal weapons charge.  Having already found that Defendant did not rely to his detriment upon the alleged promise not to prosecute, the Court would simply note that the Detectives' testimony, while ostensibly offered to support Defendant, did not bolster Defendant's case as to the issue of prejudice, but rather indicates a lack of actual prejudice and/or detrimental reliance.

     For the foregoing reasons, the Court recommends that Defendant's Motion To Dismiss Indictment be denied.

## III. CONCLUSION

For the foregoing reasons, the Court respectfully recommends that Defendant Wendall Schaffer's motions [**Docs. 36 and 39**] be **DENIED**.[3]

Respectfully submitted,


___s/ C. Clifford Shirley, Jr.___
United States Magistrate Judge

---

[3]Any objections to this Report and Recommendation must be served and filed with the clerk of the court within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140 (1985). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).